**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**


DENNIS WATKINS                                                                    PLAINTIFF


V.                                        NO. 2:09CV00048 JTR


MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                          DEFENDANT


**MEMORANDUM AND ORDER**

**I.  Introduction**

Plaintiff, Dennis Watkins, has appealed the final decision of the Commissioner of the Social

Security Administration (the "Commissioner") denying his claim for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB").   Both parties have filed Appeal Briefs (docket

entries #9 and #14), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is

supported by substantial evidence on the record as a whole and whether it is based on legal error.

*Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g).  While "substantial

evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1]

"substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing

analysis:

> "[O]ur review is more than an examination of the record for the existence of
> substantial evidence in support of the Commissioner's decision; we also take into
> account whatever in the record fairly detracts from that decision."   *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On April 12, 2004, Plaintiff filed applications for SSI and DIB, alleging disability since April 12, 2000, due to depression, back problems, and bipolar disorder.  (Tr. 13, 50-52, 58-59, 206-08, 224).  After Plaintiff's claims were denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge ("ALJ").  On August 2, 2006, the ALJ conducted an administrative hearing, during which Plaintiff and a vocational expert ("VE") testified.  (Tr. 221-48).

At the time of the administrative hearing, Plaintiff was 28-years old, had completed the ninth grade, and had obtained a GED.  (Tr. 227-28).  Plaintiff had past work experience as a farm laborer and a grocery stocker/clerk.  (Tr. 239-42).

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities.  *Id.*, § 404.1520(4)(ii), § 416.920.  If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, §

404.1520(a)(iii), § 416.920.  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work.  *Id.*, § 404.1520(4)(iv), § 416.920.  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience.  *Id.*, § 404.1520(4)(v), § 416.920.  If so, benefits are denied; if not, benefits are awarded.  *Id.*

In his May 23, 2007 decision (Tr. 13-18), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since his alleged onset date; (2) had "severe" impairments consisting of bipolar disorder, mild scoliosis, and degenerative disc disease, that did not meet a Listing;  (3) was not fully credible about his pain and discomfort; and (4) had "significant limitations in his capacity for lifting/carrying more than 5 pounds frequently and up to 10 pounds occasionally, standing/walking more than 2 hours during an 8 hour workday; sitting longer than 6 hours during an 8 hour workday, climbing, crouching, kneeling, or crawling, work at unprotected heights or around excessive vibration, more than routine interpersonal contact with others, and tasks required are simple, routine, and repetitive;" (5) could not perform his past relevant work; but (6) had the RFC for a wide a range of unskilled sedentary work, which allowed him to perform other jobs in the national economy, including positions as a product assembler and a final inspector/checker. (Tr. 17-18).  Thus, the ALJ held that Plaintiff was not disabled.  (Tr. 18).

On March 23, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.  (Tr. 4-6).  Plaintiff then filed his Complaint appealing that decision to this Court.  (Docket entry #1).

## II.  Analysis

In Plaintiff's Appeal Brief (docket entry #9), he argues that the ALJ erred: (1) in discounting his credibility; (2) in failing to engage in the regulatory psychiatric review technique; (3) in concluding that he did not have impairments meeting a Listing; (4) in assessing an RFC for a wide range of sedentary work; and (5) in relying on a defective hypothetical question to the VE.

For the reasons discussed below, the Court concludes that all of Plaintiff's arguments are without merit

### A.      Hearing Testimony and Medical Evidence

Plaintiff testified that he could read, write, and perform simple math.  (Tr. 228).  He had received vocational training in grounds keeping and bartending.  (Tr. 228). He enlisted in the Army, but was discharged because of severe scoliosis in his back.  (Tr. 231).

Plaintiff described his mental problems as follows:

Bipolar, I have a lot of trouble keeping my concentration.  I was diagnosed with ADHD as well.  Let's see, with I guess the jumping of the psychiatrist they don't really keep one specific one there, they just kind of float around with it.  The bipolar has stayed pretty steady but there's always a second one there.  One would tell me borderline personality disorder I think it's what it's called, psychotic episodes, that second one it always changes names I guess with each doctor, but the bipolar normally stays pretty steady, bipolar and ADHD.

(Tr. 233).  Plaintiff took Seroquel for his bipolar condition.  (Tr. 233).

He testified that he had pain in his shoulders, upper and lower back, neck and knees, and that he had asthma.  (Tr. 232).  According to Plaintiff, Dr. Winston restricted him from working and told him to "take it easy on the physical."  (Tr. 234).  Plaintiff could sit for 20-30 minutes.  (Tr. 234). At home, he could vacuum one room before having to "sit down and take a breather."  (Tr. 234). Plaintiff could not do any yard work because it involved bending and lifting.  (Tr. 234).

The majority of the medical evidence in this case consists of Plaintiff's psychiatric treatment from various physicians at Counseling Services of Eastern Arkansas. In March of 1999, Plaintiff made his first visit to Counseling Associates and complained of mood swings. He was diagnosed with bipolar disorder and a GAF of 70. (Tr. 151). On August 31, 2009, he was discharged from Counseling Associates due to noncompliance with medication and failure to keep appointments. (Tr. 148).

On January 13, 2001, Plaintiff returned to Counseling Associates and was diagnosed with bipolar disorder and a GAF of 60.[2] (Tr. 145). On March 7, 2002, Plaintiff saw psychiatrist Sean Buckley and reported feeling relatively stable and doing well at work and home. (Tr. 132). Dr. Buckley diagnosed Plaintiff with borderline personality disorder and polysubstance dependence, and a GAF of 55. (Tr. 132). On January 30, 2003, Counseling Services discharged Plaintiff for missing an excessive number of appointments and noncompliance with his medication regimen. (Tr. 129).

On October 9, 2003, Plaintiff visited Counseling Services and indicated that he wanted to resume his medications. (Tr. 124). He reported mood fluctuations, but stated that "the more he works the better it keeps his mind from wandering."[3] (Tr. 124). The staff psychiatrist diagnosed Mood Disorder NOS and a GAF of 61. (Tr. 128).

Plaintiff returned to Counseling Services on March 26, 2004, and requested a psychiatric evaluation based on recurring manic episodes. (Tr. 119). His mental status examination was normal

---

[2]A Global Assessment of Functioning ("GAF") score between 51 to 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.*

[3]Plaintiff also reported being an adventure seeker, and that he liked to bungee jump, sky dive, and snow ski. (Tr. 124).

and he was diagnosed with bipolar affective disorder Type I, most recent episode mixed, severe, without psychotic features. (Tr. 120). Plaintiff's GAF was 53. (Tr. 120). Dr. Gladieux placed Plaintiff on Trazadone and Lithium. (Tr. 120). On April 15, 2004, Plaintiff saw Dr. Gladieux and reported that he could not pay for blood work due to financial concerns, and expressed interest in applying for disability benefits. (Tr. 116). He reported continuing to have "spells" but that their frequency and intensity had decreased since starting Lithium. (Tr. 116). Dr. Gladieux increased Plaintiff's Lithium. (Tr. 116).

On October 18, 2004, Plaintiff reported not taking any medications because he was too busy taking care of family members to pursue follow up. (Tr. 111). Dr. Gladieux diagnosed bipolar affective disorder, type 1, mixed, severe, with psychotic features. (Tr. 111). He noted Plaintiff was stable but symptomatic, without current medications, and had a GAF of 55. (Tr. 111).

On November 18, 2004, Plaintiff complained of "intense irritability affecting his homelife" and Dr. Gladieux increased Plaintiff's Lithium. (Tr. 201). His GAF was 52. (Tr. 201).

On April 25, 2005, Plaintiff reported doing well on Seroquel, being "creative artistically," and waiting to get into college the next semester. (Tr. 194-95). On May 9, 2005, Plaintiff reported doing "very well." (Tr. 192-93). On June 13, 2005, Plaintiff reported "some sleeping difficulty," "working some part time" and "planing to relocate to find a job." (Tr. 190). On July 4, 2005, his mood was stable, and he was planning to learn motorcycle repair. (Tr. 189).

On August 25, 2005, Dr. Mohammed Al-Taher noted that Seroquel stabilized Plaintiff's mood "very efficiently." (Tr. 184). At that time, Plaintiff's main complaint was insomnia. He was working on designing a web site with his father but was pursuing disability at the same time. (Tr. 184).

On October 13, 2005, Plaintiff reported doing well on his medication and Dr. Taher assessed Plaintiff with a GAF of 60. (Tr. 182). On January 9, 2006, Plaintiff reported anger difficulties and "blind rages" and Dr. June Powell assessed his GAF as 50. (Tr. 179). Plaintiff canceled a follow-up appointment on March 3, 2006. (Tr. 178).

In early 2006, an osteopath, Dr. William Winston, saw Plaintiff a few times for complaints of pain in the back, left knee, and right hand. (Tr. 159-65). Plaintiff's knee x-ray was normal, except that the radiologist could not exclude "left knee joint effusion." (Tr. 160). Plaintiff's back x-ray showed rotoscoliosis of the thoracolumbar spine, with "mild degenerative disk changes" in the upper thoracic spine and at L3-L4. (Tr. 164). Plaintiff's right-hand x-ray showed a deformity of the right-fourth metacarpal consistent with a previous fracture, with no acute traumatic changes. (Tr. 164).

On March 27, 2006, Dr. Winston wrote a letter stating that Plaintiff had "health injuries" consisting of "severe back pain" and "severe knee pain." (Tr. 166). Based on these "injuries" and Plaintiff's age, Dr. Winston opined that Plaintiff could not engage in "substantial gainful employment" and that his "serious health conditions" precluded him from "doing any type of work." (Tr. 166).

On January 15, 2007, Plaintiff underwent a consultative examination from orthopedist Harold

Chakales. X-rays of Plaintiff's spine showed thoracolumbar scoliosis, with a kyphotic element, and degenerative disc disease. (Tr. 203). Dr. Chakales opined that Plaintiff had a "chronic problem which needs to be evaluated. He most likely needs to have an MRI of the thoracic and lumbar spine." (Tr. 203). Plaintiff had normal range of motion except for the following: (1) cervical flexion

- 40 degrees [normal 50]; (2) cervical extension - 50 degrees [normal 60]; (3) cervical lateral flexion - 40 degrees [normal 45]; (4) cervical rotation - 60 degrees [normal 80]; (5) lumbar flexion - 70 degrees [normal 90]; (6) lumber extension - 10 degrees [normal 25]; and (7) lumbar lateral extension - 10 degrees [normal 25].  (Tr. 204).  Dr. Chakales also completed a checklist assessing Plaintiff's ability to perform physical work-related activities.  According to Dr. Chakales, Plaintiff could: (1) occasionally lift/carry up to 20 lbs.; (2) sit/stand/walk for 6 hours in an 8-hour workday; (3) frequently use his arms/hands/feet; and (4) occasionally perform postural activity.  (Tr. 205).

**B.  Analysis of Plaintiff's Arguments Supporting Reversal of the ALJ's Decision**

**1.      The ALJ's Erred in Discounting Plaintiff's Credibility**

According to Plaintiff, the ALJ "essentially performed no *Polaski* analysis" in discounting his credibility.  In support of this argument, Plaintiff claims that the ALJ's decision does not mention the *Polaski* factors.  (Pltf's App. Brf. at 2-3, 16).

Plaintiff is flatly mistaken.  In his decision (Tr. 14-16), the ALJ considered Plaintiff's subjective complaints in accordance with the factors identified by the Court in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984):

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1.  the claimant's daily activities;
>
> 2.  the duration, frequency and intensity of the pain;
>
> 3.  precipitating and aggravating factors;
>
> 4.  dosage, effectiveness and side effects of  medication;

-8-

5. functional restrictions.

The ALJ cites *Polaski*, and makes it clear that he took into account matters such as Plaintiff's daily activities, medications, the precipitating/aggravating factors, and the medical record before deciding that Plaintiff's subjective complaints were not fully credible. (Tr. 14-16). After reviewing the complete record, the Court concludes that the ALJ properly evaluated Plaintiff's credibility using the factors identified by the Eighth Circuit in *Polaski*. Therefore, Plaintiff's argument is without merit.

## 2.     The ALJ Failed to Document the Psychiatric Review Technique

Next, Plaintiff argues that the ALJ erred by failing to perform the regulatory "psychiatric review technique." (Pltf's App. Brf. at 3). In evaluating mental impairments, social security regulations require the ALJ to rate the claimant's degree of functional limitations in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3). Based on this rating, the ALJ determines if the claimant's mental impairments are severe, and if so, whether the severe mental impairments are equivalent to a listed mental disorder.

Once again, Plaintiff's argument finds no support in the record. In his decision, the ALJ documented Plaintiff's ratings in the pertinent functional areas.[4] Specifically, the ALJ found that Plaintiff had: (1) moderate limitation in his activities of daily living; (2) "no significant deficit" in Plaintiff's ability to function socially; (3) no "significant levels of deficiencies" of concentration, persistence, and pace; and (4) no "actual episodes" of decompensation in a work setting. *See* Tr. 14.

---

[4]Plaintiff also mistakenly claims that the psychiatric review technique was not documented at the initial administrative level. *See* Tr. 91-104.

Accordingly, Plaintiff's argument is without merit.

### 3. The ALJ Erred in his Listing Analysis

Throughout his Appeal Brief, Plaintiff makes a number of disjointed arguments concerning the ALJ's Listing analysis. At one point, Plaintiff claims that the ALJ did not assess all of his impairments, and that these impairments, either individually or in some combination, met an unspecified Listing. (Pltf's App. Brf. at 8). Plaintiff does not explain what Listing he purportedly met, and makes no attempt to analyze how any of the evidence in this case satisfied any Listing. Plaintiff simply tallies 22 instances of his diagnoses or subjective complaints, and then surmises that the ALJ must not have evaluated all of the evidence in performing his Listing analysis. (Pltf's App. Brf. at 8).

Plaintiff's failure to offer any meaningful recitation of the applicable facts or law requires the Court to reject his argument criticizing the ALJ's Listing analysis. *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("We reject out of hand [claimant's] conclusory assertion that the ALJ failed to consider whether he met listings 12.02 or 12.05C because [claimant] provides no analysis of the relevant law or facts regarding these listings").

In the same vein, Plaintiff complains that the "ALJ found Plaintiff's back impairment was not severe enough to meet the Listing despite the facts that x-rays of Plaintiff's back showed: rotoscoliosis of the throacolumnar spine . . . with mild degenerative disk changes in the upper thoracic spine and at L3-L4." (Pltf's App. Brf. at 4). Again, the Court has no idea what Listing Plaintiff believes he met, as he provides no analysis of how this evidence satisfies any Listing. Thus, the Court also rejects this argument.

In another portion of his Appeal Brief, Plaintiff argues that his "joint pains were not properly

considered under Listing 1.02, 103, and 1.05(c)," and that "Plaintiff's combined impairments present medical findings equal in severity to all the criteria for section 1.05(c)."  (Pltf's App. Brf. at 18). However, there is simply no supporting medical evidence in this case to establish that Plaintiff satisfied these Listings.[5]

Finally, Plaintiff argues that he met the criteria for various mental disorder Listings.  Most of Plaintiff's "argument" appears to be a reproduction of text from an unidentified social security treatise summarizing the mental disorder Listings.  (Pltf's App. Brf. at 9-15).  Beyond a reference to the *entire family* of mental disorder Listings in the Social Security regulations, Plaintiff does not specify what Listing he purportedly met. (Pltf's App. Brf. at 9).  Instead, Plaintiff argues that he met the "B" criteria for these Listings, *i.e.*,  he had 2 or more of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked

---

[5]Listing 1.02 requires a showing of a "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) . . . "   In addition, there must be evidence of an involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, or involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively.
Listing 1.03 requires both an inability to ambulate effectively, as defined in 1.00B2b, and no return to effective ambulation within 12 months of the onset of the inability. *See* 20 C.F.R. § 404(P) app. 1.
Listing 1.05C was amended in 2002 and now governs amputations.  Presumably, Plaintiff does not contend that he is disabled based on an amputation.  The former Listing 1.05C, now Listing 1.04C,  governs disorders of the spine where a claimant has lumbar spinal stenosis resulting, among other things, in an "inability to ambulate effectively, as defined in 1.00B2b." *Id.* § 1.04C. Under listing 1.00B2b, an inability to ambulate effectively means "an extreme limitation of the ability to walk[.]" *Id.* § 1.00B2b(1). Examples include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* § 1.00B2b(2).

-11-

difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.  However, Plaintiff has not identified *medical evidence*, other than his subjective complaints, demonstrating that he met at least two of these criteria. For a claimant's impairments to match a Listing, they must meet all of the specified medical criteria; an impairment that meets only some of the criteria, no matter how severely, does not qualify. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Simply put, Plaintiff failed to meet his burden of coming forward with medical evidence sufficient to establish that he met a Listing.

     **4.**     **The ALJ Erred in Assessing Plaintiff's RFC**

Plaintiff argues that the ALJ erred in concluding that Plaintiff retained the RFC to perform unskilled sedentary work.  (Pltf's App. Brf. at 4, 16-17).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).  Although RFC is a medical question, the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Guilliams v. Barnhart*,  393 F.3d 798, 803 (8th Cir. 2005) (quoting *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000)).

Plaintiff emphasizes the opinion of a treating osteopath, Dr. Winston, who wrote that Plaintiff was disabled based on "severe back pain" and "severe knee pain." (Tr. 166).  However, the ALJ had valid reasons for discounting Dr. Winston's opinion.  (Tr. 16).  Notably, Dr. Winston failed to support his opinion with any evidence or treatment notes in the medical record, and it appeared to be based on an uncritical acceptance of Plaintiff's complaints of pain.  In concluding that Plaintiff's RFC allowed him to perform sedentary work, the ALJ accounted for Plaintiff having

some limitations from pain, and the ALJ's RFC assessment was consistent with the limitations imposed by consulting orthopedic specialist Dr. Chakales. (Tr. 205). Furthermore, the ALJ accounted for Plaintiff's mental limitations by restricting him to work where interpersonal contact was superficial with simple, routine, and repetitive tasks. Based upon a careful review of the record, the Court concludes that substantial evidence supports the ALJ's RFC assessment.

**5.      The ALJ Relied On an Improper Hypothetical Question To the VE**

Finally, Plaintiff argues that the ALJ failed to "fully and fairly develop Plaintiff's vocational profile." (Pltf's App. Brf. at 19). In substance, Plaintiff argues that the ALJ asked the VE a defective hypothetical question that did not accurately encompass all of Plaintiff's limitations. (Pltf's App. Brf. at 19-20).

This point for reversal is simply a restatement of Plaintiff's previous arguments that the ALJ erred in discounting his credibility and assessing an RFC for unskilled sedentary work. Because the Court concluded that those arguments had no merit, this point likewise has none.

**III.  Conclusion**

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *E.g., Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996), *superceded by statute on other grounds*; *Pratt v. Sullivan*, 956 F.2d 830, 833 (8th Cir. 1992). The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing. The Court concludes that the record as a whole contains ample evidence that "a reasonable mind might accept as adequate to support [the] conclusion" of the ALJ in this case.

*Richardson v. Perales*, 402 U.S. at 401; *see also Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).  The Court further concludes that the ALJ's decision is not based on legal error.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is affirmed and Plaintiff's Complaint is DISMISSED, WITH PREJUDICE.

DATED this 23rd day of June, 2010.

_____
UNITED STATES MAGISTRATE JUDGE